EeeemaN, J.,
delivered the opinion of the Court.
This bill is filed by complainant as one of the legatees of John Hughes, deceased, against Samuel Henderson, who qualified as the executor of the said John Hughes, after proving the will, on the 24th of January, 1861, and against John W. Miller, who, on the resignation of said Henderson, was appointed administrator de bonis non, with the will annexed, of the said John Hughes, and also against the heirs and dis-tributees of said estate.
The bill alleges that at the March term, 1861, said Henderson returned his inventory of said estate to the County Court, a copy of which is made an *319 exbibit to the bill; and that at a subsequent term said Henderson resigned his office of executor, and John W. Miller was appointed administrator de bonis non, with the will annexed, and at the March term, 1862, he returned his inventory of the estate. That on the 6th of May, 1865, said Henderson being summoned, and the parties in interest notified, appeared before the Clerk of the County Court of Williamson county, and made what purports to be a settlement of his administration of the estate, which the bill alleges “was misnamed a settlement, it being simply a statement of his own account against said estate, amounting to $5,723.21.” This account is also made an exhibit.
The bill then charges, that sometime in the year 1865, said Miller, administrator, sold a tract of land of 640 acres in Gibson county, Tennessee, for $5,000, said Henderson being the purchaser, and that the amount of said purchase money was credited on his account against the estate.
It then charges that Miller, as administrator, had obtained a judgment, principal and interest, amounting to upwards of $8,000, against Herbert S. Ewing, administrator of Brice M. Hughes, in March, 1865, and that a part of this judgment, as complainant believes, had' been collected and paid said Henderson, in full of his claim against the estate.
It farther appears that by the 9th item of the will of John Hughes, complainant was entitled to a legacy of $4,000, to be put out at interest until the death of her husband William Harrison, who had died *320 in 1865, and then with interest accumulated, after deducting compensation to the trustee, to be paid over to her. She insists that this legacy ought to have been first paid, because given in lieu of a tract of land which her father had put her in possession of, but had afterwards given to Brice M. Hughes.
She charges then that the account Henderson had rendered to the Clerk of the County Court, in the settlement of May 6,1865, which was presented by the Clerk to the Court for confirmation, is not a settlement of Samuel Henderson’s administration, but simply a one-sided account against the estate, and that said account is unjust; that it would have been settled by the testator if it had been known to exist before his death, as he was prompt in the discharge of his debts, and that a large portion of the account was barred by the statute of limitations before the death of the testator, who died about the last of the year 1860, and that the allowance of said claim, and payment of it by Miller, were illegal and void, and a fraud on legatees of the estate.
On this question the prayer of the bill is, that the said settlement of Henderson be set aside, and he be required to make a full and complete settlement, showing clearly what came to his hands, and what disbursements were made by him as executor, and that the claim of Henderson be disallowed.
The allowance of said account against the estate of John Hughes, and the effect of this settlement with the County Court Clerk, are the first questions presented for our determination.
*321 It appears that at the November Term, 1861, Henderson, the executor, filed his petition in the County-Court to be permitted to resign his office, and pass his account as executor, and that he be discharged of all future liability as such executor. At the December Term this petition was heard, no resistance having been made to it, as far as appears, when it was ordered that Henderson be discharged from his office of executor, and from all future liability as such, and that he hold the property of the estate, with all notes and accounts, choses in action, etc., now in his hands as bailee, until the appointment of his successor. It was further ordered that he make final settlement with the Clerk of this Court, and be charged with all proper charges, and credited Avith all proper credits for payments and disbursements, and that the Clerk make to him a proper allowance for his services.”
John W. Miller was appointed his successor, and on the 10th of February, 1862, Henderson handed over to said Miller an inventory of assets of said estate, and took his receipt as follows: “Received of Samuel Henderson, executor of John Hughes, deceased, all the within described notes and papers (referring to the list in the inventory) set forth in this paper.”
It is now claimed that the settlement made in pursuance of this order, whether in 1865, or after-wards, or in 1862, when it is insisted it was commenced to be made, is conclusive as to the correctness of this claim against the estate.
But we need only look to the decree of the Court to see that the settlement was not intended to be, nor *322 could it properly have been, for an ascertainment of the amount due from the estate to Henderson individually, but only to ascertain what property or assets of the estate he had received as executor, by virtue of his office, and to charge him with such assets, and credit him with all proper disbursements and payments made by him, and also to give him a proper allowance for his services, which would go as a credit to him in such settlement.
This is the extent of said decree, and is the full extent of the power of a court in such a case, in view of all the facts found in the record. It can not be maintained that the amount of this account was a credit to be given to him as a payment, for it clearly appears that it was not paid until July, 1863, by proceeds of the sale of Gibson county land; that is, $5,000 of it, less the interest, till the payments were to fall due. Henderson is certainly estopped to insist that he had paid, by way of retainer or otherwise, the amount of this debt during his term of office as executor, by his own act in insisting on its payment by the administrator de bonis non in 1865, and the actual receipt of nearly $5,000 of this very claim.
It is not necessary, in this view of the case, to look into the question, as to whether he presented this claim to the County Court in his effort at settlement with the Clerk in 1862. If he had done so, having paid and handed over all the assets of estate to his successor in February, 1862, he could not be said to have proposed a retainer of the amount of his debt; and *323 a mere presentation of his individual debt against the estate, after his removal from the office of executor, to the County Court Clerk, could not in any way serve to authenticate it, or vindicate its validity. The Clerk was only authorized to settle his account as executor, by charging him with assets received, and crediting him with disbursements properly made, and with compensation for his services. In fact we are well satisfied that Henderson resigned his office with a view of enforcing this claim against the personal representative of the estate, who might he appointed. We may add, that as it appears clearly that the settlement claimed to have been made in 1862 was never completed and presented to the Court for confirmation, in no aspect of the case can it be held as even prima facie evidence of its correctness. Code, s. 2305.
It has be'en insisted in argument that until the settlement ordered by the Court was made, the appointment of his successor, John W. Miller, as administrator de bonis non, could not be made, and was therefore void. We do not think that this is the proper construction of sec. 2237 of the Code, sub-sec. 3, which provides that, after the notice required to be given, the Court shall cause the petitioner’s accounts to be settled, and may, at its discretion, accept the resignation of the petitioner, and appoint an administrator in his stead, taking from him bond, etc. We think the requirement of the settlement is an imperative direction to the Court; but that it should be made and completed before the Court shall, in exercise of its discretion, appoint the successor, is not required. *324 It had been settled at an early day, that the County Court might permit a personal representative to surrender his trust, and appoint another in his stead, and we see nothing in the Code intended to change the rule thus established. See McGowan v. Wade, 3 Yerg., 376.
We therefore hold that the fact that this account in favor of Henderson is found as an item in the attempted settlement of his affairs as executor, in 1862, or in his last settlement with the Clerk of the County Court, and that it was confirmed by that Court, can make no difference, and that such settlement has no binding force in this case whatever.
He can only be properly allowed on his settlement such proper payments and disbursements as were actually made by him, and must be charged with all such assets as did come to his hands,* or might by reasonable diligence have come to his hands, during the term of his office.
This brings us to the next question as to an account against J. ~W. Miller, administrator de bonis non, and the propriety of allowing him a credit for said account on his settlement, as it is not pretended that he has settled his administration.
We do not think this account can be allowed, for many reasons. In the first place, on looking at it, we find the first ten or twelve items to be for board of the old man, his father-in-law, and servants, up to December 26, 1860, when he died. The proof shows that about January, 1849, the old man being owner of considerable estate, had a sale of his property, in- *325 eluding negroes, stock, etc., and distributed Ms property among Ms children; that Henderson had married his youngest daughter, and that John Hughes took them to his home and put them in possession of the same, reserving to himself one room in the house, and a negro woman, a man named Green, perhaps a boy, and a few hogs, and a horse to ride. He made a deed about this time, giving this land to his daughter, the wife of Henderson, but did not acknowledge the same till 1856, and we think from the testimony, did not deliver the deed till this date, as it seems to have been his habit with his children to let them live on his lands, but to hold the title in himself, and in one case he dispossessed the complainant in this ease of a tract of land after years ■of occupation, probably because of dislike to her husband, and gave the land to another child. He remained with his son-in-law and daughter up to his death, his negro man working on the farm for him, with the woman, until she died. It is shown that numerous settlements were made between them in this period, some of which are approved by the old man, and signed by him, and in one of which, of date April 18, 1856, an account is rendered of $8,595.07 debits against Henderson, and it is shown that on that settlement it is balanced by a note of Henderson’s for the sum of $1,442, of date January, 1856, showing that up to this date Henderson was in his debt, and gave his note for the amount, and never thought of presenting this claim of indebtedness on the part of the old man. Again, in January, 1859, *326 we find the old man gives to Henderson bis note for $331 for cash advanced for church subscription, turnpike tax, etc. We can not bring ourselves to believe but that if Henderson had ever intended, or John Hughes had ever thought, that he had to pay this account for board and services, as now claimed, some mention would have been made of it on the occasion of making some of these settlements. Take these circumstances, in connection with the presumption of law, that the giving these various notes was a settlement of all outstanding open accounts between the parties, and it is conclusive that this account for board and services, now sought to be enforced as a debt, was clearly, while the old man lived, intended to be a gratuity, acts of kindness done by a son-in-law to his father-in-law, no doubt expecting to realize from the old man’s bounty in his will full compensation, but certainly never dreaming then of claiming it as a debt to be enforced by courts of law.
This is made still stronger by the fact that Henderson, in his examination as a witness, does not dare to say that the old man ever recognized this debt, but .only, in reply to a question on the subject, answered that the old man had said, “I should never lose any thing for what I had done and was doing for him.” He says he used this expression in regard to his attention to certain law suits for him. This can only mean, taking all the circumstances of the case, that the old man intended to be liberal towards him in the disposition of his estate, which we think he has been, and so he has fairly received what he bargained for. A gratuity *327 can never be turned into a debt under such circumstances.
Again, in looking at the account made out by Henderson, on the settlement with County Court Clerk, in November, 1865, it will be seen that interest is carefully calculated on every item for four years, four months, and six days, he not daring to claim the debts due before the death of the old man.
We look at some other charges or items in said account, and can not but feel shocked at the utter want of all sense of propriety that characterize them. Henderson seems to have been a physician, yet he charged fifty dollars for “writing four or five wills, and eight or ten codicils, and getting them witnessed.” We quote the language of the account. Surely he would not have had the hardihood to present such an account to his father-in-law in his lifetime and demand its payment. He charges interest on this, too, carefully, four years, four months, and six days. .
Another item is, “to one mare which I rode to "Virginia and lost, $150,” with the same item of interest. The history of this item is, that Henderson, a number of years ago, went to Virginia to attend to some business for his father-in-law. He says he was detained longer than he perhaps expected, and found his mare so far gone with foal, that he swapped her off, we believe in East Tennessee for another, which he rode home; after he got home he bred her to a horse, and obtained a colt from her. She then took a disease, supposed to be glanders, and died, and he modestly charges his father-in-law’s estate with her *328 value, with interest for four years, four months, and six days.
We need not further particularize or discuss the items of this account. We dismiss it with the remark, that from all the surrounding circumstances, and the character of the items of which it is made up, we do not hesitate to pronounce it an after-thought, a fraudulent account, trumped up after death of the father-in-law, in order, if possible, to secure and absorb, as nearly all his estate as possible, at the expense of depriving John Hughes’s children of their legitimate share of their father’s estate, thus enriching himself at the expense of others, much more worthy of his bounty.
There is one item of indebtedness of the estate of John Hughes to Samuel Henderson which is not included in the above discussion, the note for $331, given January 13, 1859. Several questions are presented as to this note, the balance of the indebtedness claimed being out of the way.
First, that the executor has received, or did receive, assets of John Hughes during the term of his office sufficient to satisfy this debt, and that by force of the doctrine of retainer it is extinguished, whether in fact paid or not.
On looking at the inventory returned by Henderson, leaving out the land devised to be sold in Gibson county, we do not see clearly that there were assets, that is personal property, or choses in action, or money, received by him' while executor to discharge this debt. However, as the question is pressed on *329 us, and we can not, in advance of taking tbe account, say what amount and what character of assets were received by him, we dispose of this question.
First, as to the land in Gibson county, which the executor had power by the will to sell, we hold it clear this land was not such assets, that is, as lands, as would be subject to the doctrine of retainer. The rule can only apply to legal assets strictly, not to equitable assets, such as this land was at common law. Land even devised to be sold, specifically to pay debts, would not come within the rule, though a court of equity in such case would treat the land as money, yet being equitable assets, as contradistinguished from legal, the doctrine of retainer at common law would have no application.
The doctrine of retainer has been discussed in several cases in our own State, and we think, in some of them pushed to an unwarrantable extent, beyond what sound principle will justify. In case of Smith v. WatJdns, it. was held that a debt due an administrator was extinguished by receipt of assets of his intestate debtor, sufficient to satisfy the debt, and that such administrator could institute no suit afterwards for the recovery of such debt.
In that case, Samuel P. Watkins, the deceased, was indebted at his death to F. H. Watkins, the plaintiff in the suit, by writing obligatory, in the sum of $1,237. Samuel P. Watkins the debtor died, and made F. H. Watkins his executor, who qualified as such. The executor resigned in 1841, and Edmond Freeman was appointed administrator with the will *330 annexed, wbo afterwards resigned, and ultimately Smith was appointed administrator de bonis non with the will annexed, and a suit commenced on the obligation by T. H. Watkins, was revived against Smith. A plea was put into the suit, of extinguishment by way of retainer as executor. The proof showed that E. H. Watkins the executor, had received the following assets of the estate: a negro man worth $650, a girl worth $250, a watch worth $125, and other assets to the value of $135, and that he had paid out in discharge of debts, $584, and had delivered to his successor, the administrator de bonis non, the two negroes, the watch, and the other assets not paid out by him in discharge of debts. The Court held that this debt of the executor was extinguished, and that the question in the case “ could never be a matter of evidence, whether the executor did retain, in fact for his debt, but that the only question was, did he receive the assets?” To this decision we cannot give our assent, but think the sounder rule to. be the one announced by the same Court in case of Soss v. Wharton, 10 Yerg., 192, that “as the creditor who is administrator, cannot sue himself to ascertain his debt, and have execution of the assets, he must therefore retain, and the property, or rather the proceeds of it, by operation of law, become his own.”
The whole doctrine of retainer is based on the principle of advantage or benefit to the executor or administrator, given him as compensation for the legal disability to sue for his debt. It is so treated in Williams on Executors, who says: “It is another *331 of tbe privileges of an executor, that be has a right to retain for his own debt due to him from the deceased, in preference to all creditors of equal degree,” 2d voh, p. 894; and further, that “ he may appropriate sufficient part of the assets in satisfaction of his own demands, otherwise he would be exposed to the greatest hardship, for since the creditor at common law, who first commences his suit, is entitled to a preference in payment, and the executor can commence no suit, he must, in case of an insolvent estate, lose his debt, unless he has the right of retaining.” In fact, in the whole chapter on this subject, the right is treated as a privilege, and such is its legitimate foundation on principle. But how on sound principle it can be held that his debt was absolutely extinguished by receipt of slaves, and even choses in action, which he did not in fact appropriate to his debt, but was shown to have handed over, so fal’ as the slaves and watch were concerned, to his successor, as unadministered assets, remaining in specie, we are unable to see.
We admit that the early cases cited in that opinion seem to sustain the decision of the Court, on the ground that the title to so much of the property as was necessary to the payment of debts due the executor was, “by operation of the law altered and vested in himself, that is, he has them in his own right, as his own proper goods, in satisfaction of the debt, and not as executor.” This language may have been correct in its application to the eases cited from Plowden and Salkeld, but we apprehend that on examination of these cases, it will be found that the contest was *332 between some other creditor seeking to reach the goods and the executor, who claimed and asserted his right to retain for satisfaction of his debt. The case cited of Dorchester v. Webb, Cro. Cas., 373, was evidently a case where the assets were money, that could be paid out in the discharge of debt, for the Court say: “ If he pay out assets, and do not actually retain for his own debt, it is his own folly.” To this extent we think the doctrine sound, with perhaps some exceptions, as in case of Page v. Patton, 5 Peters, 311, when the executor, having his debt secured by mortgage or lien, chose to rely on that for satisfaction, rather than on retainer. To hold that the property or -choses in action, debts due the testator,, actually vested in the executor, as his own goods, in payment of his debt, would be violative of all the general provisions of our law requiring him to sell all the personal or perishable property and convert it into money, after reporting it to the Court in his inventory, he giving bond and security to appropriate it in payment of debts, and pay over at the end of two years, to legatees, or distributees, or according to law. Especially would this incongruity present itself in the case of a slave, when such property was held in this State, which would not be sold by him, but only on being shown to be necessary on application to a Court of competent jurisdiction, and then only by making the distributees or legatees parties.
How it could have been held that the property in a slave vested absolutely in the executor as his own proper goods, in payment of his debt, we can not well *333 see. Suppose the slave worth twice the amount of his debt; then howr much of the property was his? Suppose the case of notes due the testator; which note should by law vest absolutely in the executor in payment of his debt? The property must vest immediately on his appointment. How many notes or debts due the testator, or how many pieces of property, will he find ordinarily that will precisely meet his debt in value? It may be that a number of the debts due may, though solvent apparently at the time of his appointment, turn out insolvent before the end of .his administration. Shall receipt of these notes discharge and pay the debt, whether they are ever collected at all or not? Suppose the assets consist of stock, and before the time to convert it into money it dies, is the debt discharged? To hold this would be to turn a privilege into an injury, and make the case of the executor far worse than that of creditors at large.
We can not approve the decision in this case. In fact, one of the cases — Page v. Patton, 5 Peters, 311— cited by the Court as sustaining these assumed doctrines of the common law, “and upholding them in all their rigor,” fails, on examination, to do so, the Court saying, p. 364, 9th Curtis’s Cond. R., “that an administrator or executor may retain the amount of his debt out of the assets in his hands is a principle which grows out of the necessity of the case. If such right did not exist, the executor or administrator would be, in many cases, without remedy. The principle was intended for his benefit, not to mislead or entrap him.” It is a right, the Court say, “which he may *334 postpone, if in so doing lie does no injury to the estate; and such a question can only be made by the devisees or heirs. If he shall pay debts not on interest, and permit his own to run on interest, it may become a question whether he is entitled to interest. But his right to pay himself so long as the assets remain in his hands is clear.” And on p. 363, Judge McLean, who delivers the opinion of the Court, holds the precise view we have maintained in this opinion. He says: “ Is the debt paid so soon as the legal assets shall come to the hands of the administrator? That the right of action is gone is admitted, because a man cannot sue himself, and this right once extinguished, cannot be renewed. This rule is founded on reason and justice, and is well established by repeated adiu-dications.
But can the principle be extended so as to extinguish the right or retainer, where assets equal to the debt have been received and applied in payment of other demands? Such a rule would be contrary to reason and justice, and is not believed to be law.”
We therefore hold the sound principle to be, that in order to fix the extinguishment and payment of the debt of the executor or administrator, there must not only be a receipt of the assets or goods, but the money must be received for them, or come to his hands, as the property or goods themselves are not by our law contemplated as being subject to appropriation to payment of debts, but are to be sold, and the proceeds, when realized, so to be appropriated. Having come to his hands, that is money of his intestate or *335 testate debtor, under the cases in 10 Hum., 301; 3 Sneed, 607; 3 Head, 662, 663; 3 Head, 403, the executor must retain, by showing such retainer of money in his . settlement with the County Court within the period required by the statute of limitations — that is, two years and six months — on the ground that he is bound to plead this statute against other creditors, and being required by law to make his settlement in two years, he can exercise his privilege of retainer by claiming a credit on that settlement for his debt as paid. As a matter of course, if he has not received money sufficient to discharge his debt, as he cannot sue himself, and it would be absurd to say he had delayed to bring his suit at his own special instance and request, then he may retain when the money shall come into his hands, or claim a credit for his own debt when he makes final settlement, unless his debt was barred by the general statute of limitations before death of the testator or intestate.
In this view of the law, the note for $331, due January, 1859, may be contested on presentation before the Master for allowance, as a debt still claimed to exist against the estate of John Hughes, and its allowance be governed by the principle of this opinion.
The statutes of limitations of two and six years are insisted on in bar of the whole claim. As the question is directly presented in the ease, we will proceed to its decision, as far as its application might be made to the note of $331.
In case of Girdner v. Stephens; 1 Heis., in the opinion by Judge Shields, it was very decidedly main *336 tained that the effect of the war, and closing of our courts of general jurisdiction, had no influence at all on the running of these statutes, and would not prevent their operating as a bar to claims existing at the time this state of things commenced. As we shall see in this discussion, the question was not authoritatively decided in that case, and its decision was expressly waived.
We think the real question presented on the facts, is not whether the Convention or Legislature could revive or reinstate a right once certainly barred or extinguished by operation of the statute, but whether the suspension and closing of our courts, and cessation practically of all civil remedy for enforcement of legal rights, did not of itself operate to stop the running of the statute; or in other words, whether the statute by its fair terms and meaning applied to such a state of things, and was operative at all, while it lasted.
We turn to the Code, s. 2769, and find the language of the general statute of limitations as to personal actions to be as follows: “All civil actions, etc., shall be commenced after the cause of action has accrued, within the periods prescribed in this chapter, unless otherwise provided.” The following sections fix the periods in which “actions” shall be commenced in particular cases, the language of each section being,- “action shall be commenced” within the period therein prescribed.
The sections applicable to administrators and personal representatives, are 2279, 2280, and are as fol *337 lows: “The creditors of deceased persons, if they reside in the State, shall, within two years, and if without, shall within three years, from the qualification of the executor or administrator, exhibit to them their accounts, debts, or claims, and make demand, and bring suit for the recovery thereof, or be forever barred in law or equity.” “But if any creditor, after making demand of his debt or claim, delay to bring suit for a definite time at the special request of the executor or administrator, the time of such delay shall not be counted in said periods of limitation.”
What, from the language of these statutes, and from their object and purpose, (their spirit to be gathered from these two sources), was the real intention of the Legislature, and what the principle on which they rest? They all provide a period in which “ actions shall be commenced.” Does not the fair and natural exposition of this language involve the idea, that the party whose right is to be affected, shall be able to bring or commence an action? In other words, the requirement that civil actions shall be commenced within a certain period, necessarily, by the force of the language, implies that during the period mentioned and before it has expired, they may be commenced; and can it be fairly maintained that the Legislature, when it required an action to be commenced on a' note within six years, meant thereby that the bar should be operative as well when no courts were open in which an action could be commenced, as when such courts were open, and a party could commence and enforce his remedy on his cause of action? We cannot so con- *338 elude, unless we assume that the Legislature intended to require a party to sue in six years or lose his debt, and at the same time intended, that even though he could not sue, he should equally lose it. Suppose the state of things that has occurred had been anticipated by the Legislature, and the case had been put to that body, can any man believe that they would not have said, this enactment can have no application in such case, as we only mean to bar the party’s remedy for the repose of society, upon grounds of public policy, after he has been first furnished with ample remedy, and ample time in which it might be enforced. Again, suppose it had been proposed to enact a statute of limitations which should bar a remedy or right of action unknown to our law, or not in general use; would not this very enactment amount to a strong implied recognition of such remedy as existent, and one to which a party was entitled by the Legislature? Then surely it seems that the enactment of a period beyond which an action should not be brought, clearly involves the idea that the statute was only intended to be operative when such a state of things existed that within that period an action might be brought and prosecuted. We hold, therefore, that the construction of these statutes is, that they are only applicable to a normal state of things, when the machinery of government is regularly organized, and remedies are furnished to parties for the enforcement of rights through courts of justice; in the language of sec. 17 of our Bill of Rights, when “ all courts shall be open, and every man for an injury *339 done him in his lands, goods, person, or reputation, shall have remedy by due course of law.” In fact, this clause of the Constitution indicates distinctly what was the normal state, or established condition of things, under which these statutes were enacted and intended to operate. This instrument is the basis of the Government: is the Constitution, under which the Legisla-rure existed -which passed these laws. They were passed while this clause of the Constitution was a living, practical, operative provision, and in view of the fact, that this state of things, ordained and established by the supreme law of the State, was not only in actual operation, and the courts open, but that they were expected to be at all times open, and every man to be furnished in fact with a remedy by due course of law for the enforcement of all legal rights guaranteed to him.
In view of this clause of the Constitution of our State, and the clause of the Constitution of the United States, s. 10, art. 1, prohibiting any State, from “passing any law impairing the obligation of contracts,” we think that if a law had been passed by the Legislature, enacting in so many words, that a man’s right to recover his ■ debt due on a contract, should be barred in six years, or any other period, notwithstanding there were no courts in operation or open in which he could bring his suit, such law would have been declared void, as violative of the provision that the courts should be open, and every man entitled to his “remedy by due course of law” for injuries done him in his lands, goods, person, or reputation. *340 It would also have been held void as impairing the obligation of contracts — their legal obligation — which must necessarily consist in an efficient remedy for their enforcement. As we lately held at Knoxville on this question, the moral obligation of the contract is one thing, enforced in the forum of conscience alone, but its legal obligation is in its essence the legal obligement that rests on the party, by which it is to" be enforced by the law, and this legal obligement or compulsion can not be impaired; and we therefore held the stay-law of twelve months of 1861 to be void, as in violation of the constitutional inhibition. We seriously doubt whether any lawyer will maintain that the Legislature could, by direct enactment, constitutionally pass a law embodying in terms the principle maintained, though not decided, in the case of Girdner v. Stephens, 1 Heis., 280. If this be true, much more must it be held that they have not done so, when on the face of the statutes no such result was intended; on the contrary, the very opposite is fairly implied. On this question we cite from Cooley’s Const. Limit., p. 364, the following as embodying the sound principle on which statutes of limitations rest: “Limitation laws, which sometimes result in depriving a person altogether of his property, and yet are in strict conformity with the law of the land and quite unobjectionable in principle. A limitation law,” he says, “fixes upon a reasonable time within which a party is allowed to bring suit to recover his rights, and if he fails to do so, establishes a legal presumption against him that he has no rights in the prem *341 ises. It is a statute of repose. Every government is bound in good faith to furnish its citizens all needful legal remedies; but it is not bound to keep its courts open indefinitely for one who neglects or refuses to apply for redress until it may be fairly presumed that the means by which the other party. might disprove the claim are lost in the lapse of time.” He adds on p. 365: “all limitation laws, however, must proceed upon the idea that the party by lapse of time and omissions on his part, has forfeited his right to assert his title in the law.” These principles are well sustained by decisions of our courts, and will not be questioned. If the principle then be correct, that the government is bound to furnish all needful remedies to its citizens, and limitation laws are based on the idea that the party so furnished with his remedies hás by neglect and omission on his part to bring his suit and take advantage of these remedies, forfeited his right to them, then it is inevitably true that if no such remedy is within his reach, the government being in a state of revolution, so far overturned that no remedy is furnished, no neglect can be imputed, no omission charged, and therefore no forfeiture can be enforced or insisted on as having been incurred; but to enforce such forfeiture would be purely arbitrary, and a violation of every principle of justice, as well as subversive of the obligation of the contracts of parties.
We cheerfully concede the principle laid down in Girdner v. Stephens, 285, that a statute retrospective in its character and operation, directly affecting *342 and divesting vested rights, is very generally considered in this country as founded on unconstitutional principles, and inoperative and void. But we think this principle has no application to the case now in hand, because we do not think the right to the defense of the statute of limitations has ever accrued to a party, when it must be made out by counting a lapse of time in which no. courts were open in which he might commence his action. On looking at the case of Girdner v. Stephens, p. 289, we find that the precise question here presented as to the effect of the civil war and closing of the courts was not decided, the learned judge who delivered that opinion remarking, in the conclusion of it: “We do not feel ourselves called on to decide this question at present, as it does not appear in this record that the courts were closed against the institution of process in the years 1861 and 1862; and this could not appear, in fact, as we judicially know such was not the case.” He evidently inclined to the opinion, however, that the statute would run, notwithstanding the closing of the courts, and while no Judge’s opinion would be entitled to more weight than that of the writer of that opinion, we feel compelled to differ with him in this view of the question.
In this connection, it may be proper to refer to the quotation from Cooley’s Constitutional Limitations, cited by Judge Shields in his opinion in 1 Heis., 286, as to having a vested right in a defense. It is as follows: “As to the circumstances under which a man may be said to have a vested right to a defense it *343 is somewhat difficult to lay. down a comprehensive rule. He who has satisfied a demand cannot have it revived against him; and he who has become released from a demand by the' operation of the statute of limitations, is equally protected. In both eases the right is gone; to restore it would be to create a new contract for the parties; a thing beyond the power of legislation.” Cooley’s Const. Lim., 369. No cases are cited as holding this precise doctrine by Judge Cooley, but assuming the principle to be correct, yet from reference to previous principles laid down by the learned author in the discussion of this very question of the statute of limitations, he lays down the rule in exact accord with the views we have herein maintained. After saying as quoted in the previous part of this opinion that “all limitation laws, however, must proceed upon the idea that the party, by lapse of time and omission on his part, has forfeited his right to assert his title in the law,” he proceeds on the next page, 366, to add another qualification to the doctrine announced on the previous page, as to the vesting of the title to property by yirtue of the statute of limitations being a right beyond power of legislation to defeat. It is as follows: “All statutes of limitations must proceed on the idea that the party has had opportunity to try his rights in the courts. A statute which should bar the existing right of claimants without affording this opportunity after the time when the statute should take effect, would not be a statute of limitations, but. an unlawful attempt to extinguish rights, whatever it might purport to be by its terms.” If this principle be sound, then as we *344 have assumed, had the Legislature enacted by the terms of the law, that all rights existent at the commencement of our civil war should be barred in six years, notwithstanding no courts were open in which the party could enforce his claim; or in two years and six months against all parties who had claims against estates of deceased persons, on which administration had been granted, such a law would have been void, as an attempt to extinguish rights by arbitrary legislative enactment. Yet if we are to construe our statute of limitations as being operative in such a state of things, we are compelled by so doing to reach a result by construction of the statute which could not have been attained or effected had the Legislature so written the law on its face. We cannot see how this conclusion can be avoided, nor how such a doctrine can be maintained, as a lair application of the principle underlying all statutes of limitations.
There are numerous maxims of the law that furnish a sound basis for analogous reasoning in favor of the view we have taken. It is a maxim that “that which is without remedy, avails of itself, if there be no fault in the party seeking to enforce it,” or as it is put by Lord Bacon, “that when, to preserve the principles and grounds of the law, it deprives a man of his remedy, without his own fault, it will rather put him in a better degree and condition than in a worse, for if it disable him to pursue his action, or to make his claim, sometimes it will give him the thing itself by operation of law, sometimes a more beneficial remedy: Broom’s Leg. Maxims, p. 148, *345 149. The familiar cases of retainer by a personal representative in satisfaction of a debt due him from the deceased, and the common law doctrine of remitter are referred to as illustrations of this maxim. The principles being, however, simply, that where a party is deprived of the means of enforcing his right by the law, he should not be deprived of it by reason of such disability. It is true the maxim is applied to cases where the law disables a party from bringing his suit, but we think it an equally sound application of the principle, when by the action of the State government, all the machinery of the law is for the time being overturned, and the law itself exists in but a state of suspended animation, if it be not silent altogether, illustrating the maxim practically, that in the midst of arms the law is silent. Its voice was hushed, or ceased to be heard in the midst of the confusion of that eventful strife we all know.
Another maxim serving to strengthen by analogy, the view we have presented is: “The law does not seek to compel a man to do that which he cannot possibly perform:” Broom, p. 167; or as the principle is stated on p. 168, “where the law creates a duty or charge, and the party is disabled to perform it, without any default in him, and has no remedy over, then the law will in general excusé him. We might cite many of the rules of law, that have ripened into maxims — principles so long and well established as to need no authority to sustain them in support of the reasoning of this opinion.
The principle we have maintained on this question *346 is the same which has been adopted by this Court, and all the courts of the United States, both State and Federal so far as we have seen, on the question of interest accruing during the war, and on debts due citizens of one belligerent 4o citizens of the other. It has been uniformly held that interest could not be collected, and this on the plain principle that the debtor by the result of the war, could not pay, nor the creditor sue to compel him to perform his contract. See 9 Wall. R., 687, Jackson Insurance Co. v. Stewart. A. L. R., 732, vol. 6. Hanger v. Abbott, 6 Wall., 532.
Yet our statute is clear and imperative, that all bills, bonds, notes, bills of exchange, and liquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due, unless it is expressed that interest is not to accrue until a specified time therein mentioned. We have, as before stated, however, held unanimously in accordance with a uniform current of authorities, that interest did not accrue, and that such paper did not bear interest, notwithstanding the statute says it shall bear interest, and this not on the ground that this was an exception to the statute, but on the plain ground that it was not intended to apply to such a case, and that the intention and purpose of the law, was the law and not simply the literal words.
We might further illustrate and strengthen this view, as we think, by argument and authority, but we forbear. We only look for a moment at the hardships and injustice of adopting an opposite rule. *347 This case will serve to illustrate them. The note was due January, 1859; it was on the party’s father-in-law, who soon after died; the war commenced; all civil business ceases; no courts are open. The party cannot sue .his administrator; the administrator cannot sue others who may owe the estate and collect the assets; the matter goes on until the two years expire. If he then sues, the administrator is bound to plead the statute, and his debt is lost. If the administrator pays the debt, he is guilty of a devastavit, and he must pay it to the distributees or legatees. In every view cif this question, we think the ends of justice will be best subserved by holding that from the time the courts were closed no statute of limitations shall be operative.
As a matter of course, when the bar of the statute was complete before the courts ceased to be kept open and business to be done in them, we hold that it will be effective; but before this, that is the bar completed by operation of statute, with courts open in which all suits might be commenced, the Legislature or Convention might provide, as was done, that the time from the 6th of May, 1861, should not be counted, and thus leave the party where he was when he ceased to have the means of enforcing his claim, and during such closing of the courts the statute did not run, the party not being in default for not bringing his suit, no courts being open in which it could be brought, or prosecuted if brought.
The next question presented is, as to the bequest of four thousand dollars to Mary Harrison, the com *348 plainant. The language of the will, so far as is necessary to be quoted, in the ninth item, is: “I do set apart out of my estate in the hands of my executor, the sum of four thousand dollars, to be held by my executor subject to the following trusts, to-wit: during the joint lives of my said daughter Mary M., and her husband William Harrison, to be put out at interest, and so accumulate, and at the death of said William Harrison the principal and interest to be paid over to her, first deducting compensation to the trustee.” This made Henderson testamentary trustee as to this fund, as soon as it could be raised, if not on hand at the death of the old man. If it was on hand, then he would immediately become the trustee to hold the fund and its accumulation until the time when it could be paid over to the complainant, at the- death of her husband.
We think it clear that this legacy bears interest from the death of the testator, as his intention certainly was that it should accumulate. The setting apart by his will shows the intention to be, that it should take this direction from that date, when the will took effect, and not be payable at the end of a year, as is the general rule in cases of pecuniary legacies.
The next question presented is, as to the sale of the tract of land of 640 acres in Gibson county. The bill insists that this sale was void, as being beyond the power of the administrator de bonis non with the will annexed. It was held in case of Armstrong, administrator, v. Parks’ devisees, 9 Hum., where the testator provided in his will “that my ex *349 ecutors may have full power and authority to sell or lease, or dispose of in any way they may think best for my estate, all my interest in any lands, town lots, and real estate of every description, etc./’ that this trust was personal, confined, to the executors appointed by the will, and could not be exercised by the administrator with the will annexed, but by the advice and consent of the Chancellor. The principle being that in such case the person named as executor did not have the power conferred on him, simply in character of executor, but as trustee, with discretion confided to him, indicating personal confidence, and that such a trust did not go to the administrator, or devolve on him by virtue of his office as personal representative.
By the Code, s. 2240, it is provided, however, that “ an administrator with the will annexed, appointed instead of an executor resigned, and all administrators with the will annexed, shall have the same power and authority as the executor had by the will of the testator, and may sell land if the executor possessed that power.” We do not think this provision interferes with or changes the principle held in the case above cited, but that it simply authorizes the administrator to sell, where the executor as such, simply by virtue of his office, and in that character alone had power to sell; but not when the party, though executor, held the two-fold character of executor and trustee, and the power to sell was confided to him as a personal trust, to be executed by him as such trustee, and not as executor. In other words, that by the *350 statute, the administrator with the will annexed, succeeds to all the powers conferred in the will on the executor in his character of personal representative, but does not succeed to, and have devolved on him personal trusts that were not given simply in the character of executor, but in that of trustee.
The general rule before this provision was, that the executor as such, by virtue of the power contained in the will, might dispose of the real estate of the testator for the payment of debts, the payment of legacies, or any other purpose specified in the power. But even then it was held that the power was personal, and could not be exercised by an administrator with the will annexed. See Bedfield on Wills, 3 voh, 135., and authorities cited, note 27. The statute was passed to change the latter part of this rule, and confer all the powers on the administrator by virtue of his office, that belonged to executor by virtue of his.
The provision of the will under which this land was sold is item 10: — “I do will, devise, and bequeath, that all my lands and slaves, and all the property not herein otherwise fully disposed of, be sold by my executor, and the proceeds of the sale, together with all money on hand at my death, and the proceeds of all choses in action coming to me at my death, after paying my funeral expenses, my just debts, and the costs and expenses of executing this will, and after providing for the pecuniary bequests herein named, be disposd of as follows : one-fifth to each of my children; one-fifth to be set apart in the hands of my executor, and held by him subject to the trusts &c., of the $4,000 named in the *351 9tb item of this will/’ that is in favor of complainant. He then appoints Samuel Henderson executor, and should he fail to qualify, names two others as executors.
We think it clear that the power of sale here given was to the executor as such, by virtue of his office, and that such power might be rightfully exercised by the administrator with the will annexed, under the section of the Code above referred to. We therefore hold the sale of the land was not void.
It is alleged in the bill and cross-bill filed by one of the Hugheses, that the sale of the land was fraudulent and collusive between Henderson and Miller, the administrator, and for much less than its value. This is all denied in the answer. The proof shows that it was sold in July, 1865, in the midst of the confusion incident to the termination of the war; that Henderson had failed to sell it, or as far as we can see, to attempt to do so, before this time. Perhaps no blame can attach to him for such failure; but in his answer to the cross-bill, while claiming that the sale was all fair and open, he admits that he sold the land, and as otherwise appears, probably before he left Trenton, the place of purchase, at a profit of one thousand dollars. It is also shown that the land was sold on a credit of one and two years, and that he settled his claim, which we have held unjust and iniquitous, as far as the price of the land would go, by taking a receipt from Miller as follows: “ Received of Samuel Henderson, payment in full of bid for land of five thousand dollars, on credit of one and two years, less interest *352 deducted, at six per cent, per annum, for advance payment, July 15, 1865.”
We find in the answer of Atkins, who purchased from Johnston, the vendee of Henderson, that he bought, 15th November, 1865, 284 acres of the land, at ten dollars per acre; and, in March, 1866, 164 acres more of it, at eighteen dollars per acre; and if we could look at the facts thus found as evidence against Henderson, we should feel strongly inclined to hold him and Miller accountable for whatever was the real value of the land at the time, and order an account accordingly. But we think, excluding these facts, that the fact that he bought it, and paid an unfounded and pretended debt, gotten up, as we believe, after the death of John Hughes, from fraudulent motives, that he can not be allowed to make a profit by such a transaction, and should be held to account for the price of the land on the terms of sale, that is one and two years from its date.
We further think that having got a clear title to the land, by paying for it on the basis of cash, with a fraudulent and unfounded claim, he has thus by fraud obtained the means of making the one thousand dollars profit for which he sold it, and having in addition to this, strong suspicion, that this hasty sale of the land at the end of the war, was not free from collusion, we hold that he cannot be permitted in equity to retain this money, thus fraudulently obtained, or make any profit by his fraudulent act.
We have thus gone through with the leading questions presented in this somewhat complicated case.
*353 The conclusion is, that the account rendered by-Henderson to the County Court will be set aside, and his accounts strictly as executor be rendered, on the principles of this decree.
He will be charged with all assets he received, and has not paid over to the administrator with the will annexed, or such as might have been by him received by proper diligence, and credited with all proper payments, but will not be allowed compensation for his services during the period of his executor-ship.
That Henderson will account for the price of the land, with interest as stated in this opinion.
That Miller will be required to render an account as administrator, on the same principles as indicated against Henderson, charging him with all the assets received, or that might have been received by proper diligence, he being charged with the price of the land, unless it can be collected from Henderson.
Mrs. Harrison is not entitled to any preference over and above other specified legatees in payment of the $4,000, but is entitled to interest on the same from the time of the death of testator, or on her pro rata share if there be a deficiency of assets, so that all legacies have to abate.
Henderson and Miller will pay each, one-half the . cost of this case, both in the Court below, and in this Court.