Story, J.,
 

 did not sit
 

 in this cause, some distant relative of his having an interest in it.)
 

 *Johnson, J.,
 

 after stating the facts of the case, as before mentioned, delivered the opinion of the court, as follows : — The' very peculiar circumstances of this case require the application of a variety of principles; and the court has not been aided in its inquiries, by that elaborate discussion which such novel cases generally elicit. But they are
 
 *144
 
 relieved by the reflection, that tbe principles to wbicb they must resort in forming their judgment are well established, and lead satisfactorily to a conclusion. The most natural mode of acquiring a definite idea of the rights of the libellants in the subject-matter, will be, to follow it
 
 through the
 
 successive changes of circumstances by which the nature and extent of the rights of the parties were affected. The capture, the donation, the arrival in the United States, and the state of war.
 

 As between the belligerents, the capture, undoubtedly, produces a complete divesture of property. Nothing remains to the original proprietor but a mere
 
 scintilla juris,
 
 the
 
 spes recuperandi.
 
 The modern and enlightened practice of nations has subjected all such captures to the scrutiny of judicial tribunals, as the only practical means of furnishing documentary evidence to accompany ships that have been captured, for the purpose of proving that the seizure was the act of sovereign authority, and not mere individual outrage. In the case of a purchase made by a neutral, Great Britain demands the production of such documentary evidence, issuing from a court of competent authority, or will dispossess the purchaser of a ship, originally British.
 
 The Fladoyen,
 
 1 Rob. 114, 135. Upon the donation, therefore, whatever right might, in the abstract, have existed in the captor, the donee could acquire no more than what was consistent with his neutral character to take. He could be in no better situation than a prize-master navigating the prize, in pursuance of orders from his commander. The vessel remained liable to British capture, on the whole voyage. And on her arrival in a neutral territory, the donee sunk into a mere bailee for the British claimant, with those rights over the *thing in possession, which the civil law gave*for care p2o7 and labor bestowed upon it. L
 

 The question then occurs, is this a case of salvage ? On the negative of the proposition, it is contended, that it is a case of forfeiture, and therefore, not a case of salvage, as against the United States ; that it was an unneutral act, to assist the enemy in bringing the vessel
 
 infra prmidia,
 
 or into any situation where the rights of re-capture would cease, and therefore, not a case of salvage as against the British claimant. But the court entertain an opinion unfavorable to both these objections.
 

 This could never have been a case within the view of the legislature, when passing the non-importation act. The ship was the plank on which the shipwrecked mariner reached the shore ; and although it may be urged, that bringing in the cargo was not necessarily connected with their own return to their country, yet, upon reflection, it will be found, that this also can be excused, upon very fair principles. It was their duty to adhere strictly to their neutral character; but to have cast into the sea the cargo, the property of a belligerent, would have been to do him an injury, by taking away that chance of recovery subject to which they took it into ther possession. Besides, bringing it into the United States, did not necessarily pre-suppose a violation of the non-importation laws. If it came within the description of property cast casually on our shores, as we are of opinion it did, legal provision exists for disposing of it in such a manner as would comport with the policy of our laws. At last, they could but deliver it up to the hands of the government, to be re-shipped by the British claimant, or otherwise appropriated under the sanction of judicial process. And such was the course that they pursued. Far from attempting any violation of the laws of the
 
 *145
 
 country, upon tbeir arrival here, they deliver it up to the custody of the laws, and leave it to be disposed of under judicial sanction. The case has no one feature of an illegal importation, and cannot possibly have imputed to it the violation of law.
 

 * , *As to the question arising on the interest of the British claimant, -* it would, at this time, be a sufficient answer, that they who have no rights in this court, cannot urge a violation of their rights, against the claim •of the libellants. But there is still a much more satisfactory answer: to have attempted to carry the vessel “
 
 infra prmsidtian
 
 of the enemy, would, unless it could have been excused on the ground of necessity, have been an unneutral act. But when every exertion is made to bring it to a place of safety, in which the original right of the captured would revive, and might be assorted, instead of aiding his enemy, it is doing an act exclusively resulting to the benefit of the English claimant.
 

 It being determined to be a case of salvage, the next question is, as to the amount to be allowed. On this subject, there is no precise rule ; nor is it, in its nature, reducible to rule. For it must, in every case, depend upon peculiar circumstances, such as peril incurred, labor sustained, value decreed, ■&c.; all of which must be estimated and weighed by the court that awards the salvage. So far as our inquiries extend, when a proportion of the thing saved has been awarded, a half has been the maximum, and an eighth the
 
 minimum;
 
 below that, it is usual to adjudge a compensation
 
 in numero.
 
 In some cases, indeed, more than a half may have been awarded ; but they will be found to be cases of very extraordinary merit, or on articles of very small amount. In the present case, the account sales of the cargo was near $16,000 ; and we are of opinion, that the one-half of that sum will .be an adequate compensation.
 

 The next question arises on the application of the residue. On this point, the court is led to a conclusion, by the following considerations : At the arrival of the vessel in the United States, the original British owner would, unquestionably, have been entitled to the balance. The state of war, however, at present, prevents his interposing a claim in the courts of this country. But as this property was found within the United States, at the declaration of war, it must stand on the same footing with other British property similarly situated. Although property of that deseription is liable to be disposed of by the legislative *power of the country, yet, until some act is passed upon the subject, it is still under the protection of the law, and may be claimed, after the termination of war, if not previously confiscated. We will, therefore, make such order respecting it, as will preserve it, subject to the will of the court, to be disposed of as future circumstances shall render proper. *229]
 

 As to the mode of distributing the amount of the salvage, the court have concluded to adopt an arbitrary distribution ; because there exists no positive rule on that subject. They would have adopted the rules of the prize act relative to cases of salvage, had the circumstances of the case admitted of its application.
 

 This court orders and decrees, that the decree of the circuit court of Virginia, in this case, be reversed ; that the costs and charges be paid out of the proceeds of the sale ; that the one-half of the balance be adjudged to the libellants, to be divided into thirteen and a half parts, three of which
 
 *146
 
 shall be paid to the master, two to the supercargo, two to the chief mate, one and a half to the second mate, and one to each of the seamen. And that the balance be deposited in the bank of Virginia, to remain subject to the future order of the circuit court.
 

 Judgment reversed.