HANGER v. ABBOTT.

The time during which the courts in the lately rebellious States were closed to citizens of the loyal States, is, in suit brought by them since, to be excluded from the computation of the time fixed by statutes of limitation within which suits may be brought; though exception for such cause be not provided for in the statutes. And this independently of the Act of Congress of June 11th, 1864.

ERROR to the Circuit Court for the Eastern District of Arkansas.

* 2 Wallace, 404.

J. & E. Abbott, of New Hampshire, sued Hanger, of Arkansas, in assumpsit. The latter pleaded the statute of limitations of Arkansas, which limits such action to three years. The former replied the rebellion, which broke out after the cause of action accrued, and closed for more than three years all lawful courts. On demurrer, and judgment against it, and error to this court, the question here was, simply, whether the time during which the courts in Arkansas were closed on account of the rebellion, was to be excluded from the computation of time fixed by the Arkansas statute of limitations within which suits on contracts were to be brought, there being no exception by the terms of the statute itself for any such case.

*Mr. Reverdy Johnson, for the plaintiff in error*, cited *Alabama* v. *Dalton* in this court;* *Mr. S. C. Eastman, contra*, placed the case on general principles of law, and on an act of Congress of June 11th, 1864, ch. cxviii.

Mr. Justice CLIFFORD delivered the opinion of the court.

The declaration was in assumpsit, and the plaintiffs alleged that the defendant, on the tenth day of April, 1865, was indebted to them for divers goods, wares, and merchandise, and also for money had and received, in the sum of ten thousand dollars. Defendant appeared and pleaded two pleas in answer to the declaration:

(1) That he never promised as the plaintiffs have alleged.

(2) That the cause of action did not accrue at any time within three years next before the commencement of the suit.

Issue was joined by the plaintiffs on the first plea, and in answer to the second, they filed seven replications, but particular reference need only be made to the fifth and sixth of the series.

Substance of the fifth replication was, that the defendant, from the sixth day of May, 1861, to the first day of January,

---

* 9 Howard, 522.

1865, was an actual resident of Arkansas, and that the plaintiffs were, at the same time, actual residents of New Hampshire, and that, during the whole of that period, they were prevented, by reason of resistance to the execution of the Federal laws, and the interruption of the ordinary course of judicial proceedings, in the former State, from instituting their action, and from having the defendant served with proper process; and so they aver that they did commence their suit within three years next before the cause of action accrued.

Sixth replication alleges, that the parties respectively had been, for more than three years before the commencement of the suit, actual residents of their respective States, and that the cause of action accrued before the twenty-fifth day of October, 1859, and that after the same had so accrued, to wit, on the sixth day of May, 1861, all the lawful courts of the State where the defendant resided were closed by reason of the insurrection and rebellion which then and there arose against the lawful authority of the United States; that the courts so remained closed from that day to the first day of January, 1865, and so the plaintiffs say that the period during which the courts were not open for the reasons stated, should not be deemed and taken as any part of the three years' limitation, as pleaded; and they in fact say that they did commence their suit within three years next before the cause of action accrued.

Demurrers were filed by the defendant to the replications, and the court gave judgment for the plaintiffs in the sum of nine thousand four hundred eighty-three dollars and twenty-six cents damages and costs of suit; whereupon the defendant sued out this writ of error.

Proclamation of blockade was made by the President on the nineteenth day of April, 1861, and, on the thirteenth day of July, in the same year, Congress passed a law authorizing the President to interdict all trade and intercourse between the inhabitants of the States in insurrection and the rest of the United States.*

---

* 12 Stat. at Large, 1258–257.

War, when duly declared or recognized as such by the war-making power, imports a prohibition to the subjects, or citizens, of all commercial intercourse and correspondence with citizens or persons domiciled in the enemy country.* Upon this principle of public law it is the established rule in all commercial nations, that trading with the enemy, except under a government license, subjects the property to confiscation, or to capture and condemnation.†

Partnership with a foreigner is dissolved by the same event which makes him an alien enemy, because there is in that case an utter incompatibility created by operation of law between the partners as to their respective rights, duties, and obligations, both public and private, which necessarily dissolves the relation, independent of the will or acts of the parties.‡ Direct consequence of the rule as established in those cases is, that as soon as war is commenced all trading, negotiation, communication, and intercourse between the citizens of one of the belligerents with those of the other, without the permission of the government, is unlawful. No valid contract, therefore, can be made, nor can any promise arise by implication of law, from any transaction with an enemy. Exceptions to the rule are not admitted; and even after the war has terminated, the defendant, in an action founded upon a contract made in violation of that prohibition, may set up the illegality of the transaction as a defence.§ Various attempts, says Mr. Wheaton,‖ have been made to evade the operation of the rule, and to escape its penalties, but they have all been defeated by its inflexible rigor. All foreign writers on international law concur in the opinion that the immediate and necessary consequence of a declaration of war is to interdict all intercourse or dealings between the

---

\* The William Bagaley, 5 Wallace, 405; Jecker et al. v. Montgomery, 18 Howard, 111; Wheaton on Maritime Captures, 209.

† The Rapid, 8 Cranch, 155; The Hoop, 1 Robinson Admiralty, 196.

‡ Maclachlan on Shipping, 475; Story on Partnership, § 316; Griswold v. Waddington, 15 Johnson, 57; Same case, 16 Id. 438.

§ Williamson v. Patterson, 7 Taunton, 43.

‖ On International Law, by Lawrence, 551, 556.

subjects of the belligerent states. Hostilities once commenced, any attempt at trading on the part of the subjects of either state, unless by permission of the sovereign, is prohibited, and becomes *ipso facto* a breach of the allegiance due to their respective sovereigns, and as such is forbidden by the public law of the civilized world.*

Executory contracts also with an alien enemy, or even with a neutral, if they cannot be performed except in the way of commercial intercourse with the enemy, are dissolved by the declaration of war, which operates for that purpose with a force equivalent to an act of Congress.†

In former times the right to confiscate debts was admitted as an acknowledged doctrine of the law of nations, and in strictness it may still be said to exist, but it may well be considered as a naked and impolitic right, condemned by the enlightened conscience and judgment of modern times.‡ Better opinion is that executed contracts, such as the debt in this case, although existing prior to the war, are not annulled or extinguished, but the remedy is only suspended, which is a necessary conclusion, on account of the inability of an alien enemy to sue or to sustain, in the language of the civilians, *a persona standi in judicio.*§

Trading, which supposes the making of contracts, and which also involves the necessity of intercourse and correspondence, is necessarily contradictory to a state of war, but there is no exigency in war which requires that belligerents should confiscate or annul the debts due by the citizens of the other contending party.

We suspend the right of the enemy, says Mr. Chitty, to the debts which our traders owe to him, but we do not annul the right. We preclude him during war from suing to recover his due, for we are not to send treasure abroad for the direct supply of our enemies in their attempt to destroy us, but with the return of peace we return the right and the

---

* Bynkershoek, B. 1, c. 3; Vattel, B. 3, c. 4; Potts v. Bell, 8 Term, 561.
† Exposito v. Bowden, 4 Ellis & Blackburne, 963; Same case, 7 Id. 778.
‡ Kent's Com. (11th ed.), 73.
§ 1 Id. (11th ed.), 76   Flint v. Waters, 15 East, 260.

remedy.* During war, says Sir William Scott, there is a total inability to sustain any contract by an appeal to the tribunals of the one country on the part of the subjects of the other.† Views of Mr. Wheaton are, and they are undoubtedly correct, that debts previously contracted between the respective subjects, though the remedy for their recovery is suspended during war, are revived on the restoration of peace, unless actually confiscated in the meantime in the rigorous exercise of the strict rights of war, contrary to the milder rules of recent times. He says, in effect, that the power of confiscating such debts theoretically exists, though it is seldom or never practically exerted; that the right of the creditor to sue for the recovery of the debt is not extinguished, that it is only suspended during the war, and revives in full force on the restoration of peace.‡

Under the thirty-fourth section of the Judiciary Act, the statutes of limitations of the several States, where no special provision has been made by Congress, form the rule of decision in the courts of the United States, and the same effect is given to them as is given in the courts of the State.§

Grant that the law of nations is that debts due from individuals to the enemy may, by the rigorous application of the rights of war, be confiscated, still it is a right which is seldom or never exercised in modern warfare, and the rule is universally acknowledged that if the debts are not so confiscated, the right to enforce payment revives when the war has terminated.‖ Vattel says the sovereign may confiscate debts

---

* Chitty on C. & M. 423.

† The Hoop, 1 C. Robinson's Adm. 200; Alcinous v. Nigreu, 4 Ellis & Blackburne, 217.

‡ Wheaton's International Law, by Lawrence, 541–877; Furtado v. Rogers, 3 Bosanquet & Puller, 191; Ex parte Boussmaker, 13 Vesey, Jr., 71; Signora, Edward's Adm. 60; Brown v. United States, 8 Cranch, 110; Ware v. Hilton, 3 Dallas, 199; Upton, Maritime W. & P. 42; Halleck's International Law, 358.

§ Angell on Limitations, § 24; McCluny v. Silliman, 3 Peters, 270; Bank of United States v. Daniels, 12 Peters, 32; Porterfield v. Clark, 2 Howard, 125.

‖ Manning, International Law, 130; Bynkershoek, B. 1, c. 3.

due from his subjects to the enemy, if the term of payment happens in time of war, or at least he may prohibit his subjects from paying while the war continues, but at present a regard to the advantages and safety of commerce induces a less rigorous rule.*

Where a debt has not been confiscated, the rule is undoubted that the right to sue revives on the restoration of peace, and Mr. Chitty says that with the return of peace we return to the creditor the right and the remedy. Unless we return the remedy with the right the pretence of restoring the latter is a mockery, as the power to exercise it with effect is gone by lapse of time during which both the right and the remedy were suspended.

When our ancestors immigrated here, they brought with them the statute of 21 Jac I, c. 16, entitled "An act for limitation of actions, and for avoiding of suits in law," known as the statute of limitations. Proceedings in courts of justice are usually determined by the *lex fori* of the place where the suit is pending, including the statutes of limitation, which are those of the country where the suit is brought, and not those of the *lex loci contractus*.†

Such statutes exist in all the States, and with few exceptions they have been copied from the one brought here in colonial times. They are statutes of repose to quiet titles, to suppress fraud, and to supply the deficiency of proofs arising from the ambiguity and obscurity or antiquity of transactions. They proceed also upon the presumption that claims are extinguished whenever they are not litigated in the proper forum within the prescribed period, and they take away all solid ground of complaint, because they rest on the negligence or *laches* of the party himself.‡

Persons within the age of twenty-one years, *femes covert*, *non compos mentis*, persons imprisoned or beyond the seas, were excepted out of the operation of the third section of

---

* Vattel, B. 3, c. 5, § 77.

† Townsend v. Jamison, 9 Howard, 407; Wheaton's International Law, by Lawrence, 187–288; Story, Conflict of Laws, § 577.

‡ Story, Conflict of Laws, § 576; Chitty on Contracts (10th Am. ed.), 907

the act, and were allowed the same period of time after such disability was removed.   Just exceptions indeed are to be found in all such statutes, but when examined it will appear that they were framed to prevent injustice and never to encourage laches or to promote negligence.   Cases where the courts of justice are closed in consequence of insurrection or rebellion are not within the express terms of any such exception, but the statute of limitations was passed in 1623, more than a century before it came to be understood that debts due to alien enemies were not subject to confiscation. Down to 1737, says Chancellor Kent, the opinion of jurists was in favor of the right to confiscate, and many maintained that such debts were annulled by the declaration of war. Regarding such debts as annulled by war, the law-makers of that day never thought of making provision for the collection of the same on the restoration of peace between the belligerents.   Commerce and civilization have wrought great changes in the spirit of nations touching the conduct of war, and in respect to the principles of international law applicable to the subject.

Constant usage and practice of belligerent nations from the earliest times subjected enemy's goods in neutral vessels to capture and condemnation as prize of war, but the maxim is now universally acknowledged that "free ships make free goods" which is another victory of commerce over the feelings of avarice and revenge.   Individual debts, as a general remark, are no longer the subject of confiscation, and the rule is universally admitted that if not confiscated during the war, the return of peace brings with it both "the right and the remedy." *

Total inability on the part of an enemy creditor to sustain any contract in the tribunals of the other belligerent exists during war, but the restoration of peace removes the disability, and opens the doors of the courts.   Absolute suspension of the right, and prohibition to exercise it, exist during war by the law of nations, and if so, then it is clear that

---

* Wolf *v.* Oxholm, 6 Maull & Selwyn, 92.

peace cannot bring with it the remedy if the war is of much duration, unless it also be held ·that the operation of the statute of limitation is also suspended during the period the creditor is prohibited, by the existence of the war and the law of nations, from enforcing his claim. . Neither laches nor fraud can be imputed in such a case, and none of the reasons on which the statute is founded can possibly apply, as the disability to sue becomes absolute by the declaration of war, and is a conclusion of law.* Ability to sue was the status of the creditor when the contract was made, but the effect of war is to suspend the right, not only without any fault on his part, but under circumstances which make it his duty to abstain from any such attempt. His remedy is suspended by the acts of the two governments and by the law of nations, not applicable at the date of the contract, but which comes into operation in consequence of an event over which he has no control.

Old decisions, made when the rule of law was that war annulled all debts between the subjects of the belligerents, are entitled to but little weight, even if it is safe to assume that they are correctly reported, of which, in respect to the leading case of *Prideaux* v. *Webber*† there is much doubt. *Miller* v. *Prideaux*,‡ *Lee* v. *Rogers*,§ *Hall* v. *Wybourne*,‖ *Aubrey* v. *Fortescue*,¶ are of the same class, and to the same effect. All of those decisions were made between parties who were citizens of the same jurisdiction, and most of them were made nearly a hundred years before the international rule was acknowledged, that war only suspended debts due to an enemy, and that peace had the effect to restore the remedy. The rule of the present day is, that debts existing prior to the war, but which made no part of the reasons for undertaking it, remain entire, and the remedies are revived with the restoration of peace.**

The suspension of the remedy during war is so absolute

---

* 2 Wildman's International Law, 17.   † 1 Levinz, 31.
‡ 1 Keble, 157.    § 1 Levinz, 110.   ‖ 2 Salkeld, 420.
¶ 10 Modern, 205.
** 1 Kent's Com. (11th ed), 169; Grotius, B. 3, c. 20, §§ 16–18.

that courts of justice will not even grant a commission to take testimony in an enemy's country.* But when the reason for the suspension ceases, the right to prosecute revives, and the fact that the right had been suspended constitutes no disability.†

When the courts of justice are open, and judges and ministers of the same may by law protect men from wrong and violence, and distribute justice to all, says Lord Coke, it is said to be time of peace, but when by invasion, insurrection, rebellion, or such like, the peaceable course of justice is disturbed and stopped, so as the courts of justice be, as it were, shut up, *et silent leges inter arma,* then it is said to be time of war; and having described the conditions, both of war and peace, he adds emphatically, that if a man is disseized in time of peace, and the descent is cast in time of war, this shall not take away the entry of the disseizee, which is a direct authority for the plaintiffs in this case.‡

Text writers usually say, on the authority of the old cases referred to, that the non-existence of courts, or their being shut, is no answer to the bar of the statute of limitations, but Plowden says that things happening by an invincible necessity, though they be against common law, or an act of Parliament, shall not be prejudicial. That, therefore, to say that the courts were shut, is a good excuse on voucher of record.§ Exceptions not mentioned in the statutes have sometimes been admitted, and this court held that the time which elapsed while certain prior proceedings were suspended by appeal, should be deducted, as it appeared that the injured party in the meantime had no right to demand his money, or to sue for the recovery of the same; and in view of those circumstances, the court decided that his right of

---

* Barrick *v.* Buba, 32 English Law and Equity, 465; Wood *v.* Allen, 2 Dallas, 102.

† Foxcraft *v.* Galloway, 2 Dallas, 132; Wall *v.* Robson, 2 Nott & McCord, 498; Hopkins *v.* Bell, 3 Cranch, 458; Higginson *v.* Air, 1 Desaussure, 427.

‡ 2 Co. Litt. 249 b; Bracton, lib. 4, fol. 240; 1 Hale's P. C. 347.

§ Brooke, tit. Failure of Record; Blanshard on Limitations, 163; 6 Bacon's Ab. 395; 1 Plowden, 9 b.

action had not accrued so as to bar it, although not commenced within six years.* But the exception set up in this case stands upon much more solid reasons, as the right to sue was suspended by the acts of the government, for which all the citizens are responsible. Unless the rule be so, then the citizens of a State may pay their debts by entering into an insurrection or rebellion against the government of the Union, if they are able to close the courts, and to successfully resist the laws, until the bar of the statute becomes complete, which cannot for a moment be admitted. Peace restores the right and the remedy, and as that cannot be if the limitation continues to run during the period the creditor is rendered incapable to sue, it necessarily follows that the operation of the statute is also suspended during the same period.

Reference is made to the remarks of the judge who gave the opinion in the case of *Alabama* v. *Dalton*,† but the case then before the court involved no such question as is presented in this case, and those remarks are more than counterbalanced by those made by the Chief Justice in *McIver* v. *Ragan*,‡ where he admits that the case would be within the exceptions to the statute, if it appeared that the courts of the country were closed so that no suits could be instituted.

Viewed in any light, we think the decision of the Circuit Court overruling the demurrer to the fifth and sixth replications of the plaintiffs was correct.

Plaintiffs also rely upon the act of Congress of the eleventh of June, 1864, as being sufficient to take the case out of the operation of the statute, but it is not necessary to decide that point in this case, and we express no opinion upon the subject.

JUDGMENT AFFIRMED WITH COSTS.

---

* Montgomery v. Hernandez, 12 Wheaton, 129.
† 9 Howard, 522.                ‡ 2 Wheaton, 29.