ST. LOUIS & S. F. RY. CO. v. O'LOUGHLIN.

*(Circuit Court of Appeals, Eighth Circuit. February 15, 1892.)*

1. RAILROAD COMPANIES—KILLING STOCK—INSTRUCTION—HARMLESS ERROR.
    In an action for the killing of a mule, struck by a locomotive on the prairie in broad daylight, three passengers on the train testified that they saw a bunch of mules ahead of the train; that they ran a considerable distance along the track; that the train was running at a good speed, and was not slowed up until it ran into and scattered the mules; and that it seemed as if the engineer were trying to run them down. Defendant failed to call the engineer as a witness, or to offer any evidence on this issue. *Held* harmless error to charge that the engineer was bound to use the "utmost" care, as it was evident that no care whatever was exercised.
2. INDIAN TERRITORY—LIMITATIONS—MISSOURI STATUTES.
    The statutes of the territory of Missouri, including the statute of limitations, ceased to operate in the region now composing the Indian Territory when that region ceased to be a part of Missouri, and there was no statute of limitations in force in the Indian Territory from that time until May 2, 1890, when congress extended over it the statute of Arkansas.

In Error to the United States Court in the Indian Territory.

Action by John O'Loughlin against the St. Louis & San Francisco Railway Company to recover for the killing of a mule. Verdict and judgment for plaintiff. Defendant brings error. Affirmed.

*E. D. Kenna* and *L. F. Parker*, for plaintiff in error.

*S. B. Dawes* and *W. P. Thompson*, for defendant in error.

Before CALDWELL, Circuit Judge, and SHIRAS and THAYER, District Judges.

CALDWELL, Circuit Judge. This action was commenced in the United States court in the Indian Territory by O'Loughlin against the railway company, to recover damages for a mule alleged to have been killed by the negligence of the company. The defense was a general denial, and a plea of the statute of limitations of three years. The plaintiff recovered judgment below for $241.65, and the company sued out this writ of error.

The first error assigned is that there is no evidence of negligence. There is in the record the testimony of three witnesses, who were passengers on the passenger train which struck and injured the plaintiff's mule, and from which injuries it soon thereafter died. One of these witnesses testifies that "the train was running at about its usual rate of speed. There was a bunch of mules on the prairie in front of the train, and the engineer seemed to be trying to run them down; for we were going over a rough 'road, and running at a good speed, as fast or faster than its usual speed on good road. There was a slough on one side of the track, and some mud holes on the other side. I saw the bunch of mules on the prairie, near the track, in front of the train. When the train run into the bunch, they scattered." The second witness testified that he "was looking out the window, and saw a bunch of mules, four or six in number, on the prairie, near the railroad, in front of the train. They started off in a run down the track, and it looked like the engineer was trying to run them down. The train run into the bunch. * * * I then

saw the gray mule in question. It was plaintiff's. The train slowed up just as it run into the bunch of mules." In answer to questions on cross-examination he said: "I thought the engineer was trying to run the mules down, because they ran some distance along by the track in front of the train, and the train did not slow up until it ran into and scattered the bunch." The third witness testified that he "saw five or six mules in the prairie, running along in front of the train. The engineer whistled and slowed up just as it scattered the mules. I then saw a gray mule getting up out of a hole of water near the engine. It looked like the engineer had knocked the mule off the track. I don't think the train slowed up until it run into the bunch of mules." All this occurred in broad daylight, on an open, level prairie. If the engineer did not see the mules under those conditions in time to avoid running into them, it was because he was not exercising that reasonable degree of care and watchfulness which the law requires of him. But it is obvious that he did see the mules, and did not exercise any degree of care to avoid injuring them. The witnesses all agree in saying that he seemed to be trying to run the mules down, and never whistled or slowed up until just as the engine struck and scattered them. This is not the case of animals suddenly and unexpectedly running across or coming upon the track. The mules were going "in a run down the track," and "ran some distance along by the track in front of the train." The engineer was not called as a witness. The defendant introduced no testimony on this issue, and no explanation was offered as to why the engineer did not stop or slacken the speed of the engine before running the mules down. The verdict was right, and was the only one the jury could have rendered upon this evidence. It is quite immaterial that the court told the jury that it was the duty of the engineer to exercise the "utmost" care to avoid killing stock on the track after he saw it. He exercised no care at all, but was guilty of a high degree of negligence. The jury must have found as they did, if they had been instructed that it was only necessary for him to exercise the slightest degree of care. No degree of care whatever was exercised, but, on the contrary, it is clear that the engineer was guilty of culpable negligence. The defendant, therefore, was not prejudiced by the error of the court in defining the degree of care which an engineer must exercise to avoid injury to stock which he sees upon the track. Thomp. Trials, §§ 2401–2403; *Sanger v. Flow*, 48 Fed. Rep. 152.

The court sustained a demurrer to defendant's plea to the statute of limitations of three years, and this ruling is assigned for error. The cause of action accrued in the Indian Territory in March, 1882. The learned counsel for the plaintiff in error says the plea of the statute of limitations is rested on the statute of limitations of the territory of Missouri, which, it is claimed, was in force in the Indian Territory when that country was a part of the territory of Missouri. The contention is that that statute remained in force in the Indian country, notwithstanding the separation of the territories, and the cession by the government to the Indians of the land in, and the government over, the Indian Ter-

ritory. But the contention is not tenable. More than 60 years ago the country now known as the "Indian Territory" was granted by the United States, by treaty, to the Cherokee and other nations of Indians now in that territory. The preamble to the treaty made with the Cherokee Nation on the 6th of May, 1828, declares that, it "being the anxious desire of the government of the United States to secure to the Cherokee Nation of Indians   *   *   .*   a permanent home, and which shall under the most solemn guaranty of the United States be and remain theirs forever,—a home that shall never in all future time be embarrassed by having extended around it the lines, or placed over it the jurisdiction, of a territory or state, nor be pressed upon by the extension in any way of any of the limits of any existing territory or state," etc. The terms of the treaty gave effect to these expressed desires of the government. The treaty with the Choctaw Nation of September 27, 1830, is of similar import. These treaties convey the lands described in them to the Indian nations named, in fee-simple, and under their provisions the only local laws and governments that were to obtain or have any force in that country, aside from the laws of the United States, were the laws and governments of the Indian nations inhabiting it. The government bound itself in the most solemn manner to exclude white people from the territory, and never permit the laws of any state or territory to be extended over it.

It would serve no useful purpose in this case to go into the history of the government's relations to these Indians prior to the making of these treaties, and to explain why it was that the Indians demanded, and the government conceded to them, so much. The operation of the Indian laws, and the jurisdiction of Indian courts, were restricted to the Indians. The Indian laws had no operation on citizens of the United States or of the states, natural or artificial, and the Indian courts could exercise no jurisdiction over them. On the 1st day of March, 1889, congress, with the assent of the Indians, passed an act (chapter 333, p. 783, 25 U. S. St. at Large) creating a court for the Indian Territory, and conferred on it "jurisdiction in all civil cases between citizens of the United States who are residents of the Indian Territory, or between citizens of the United States, or of any state or territory therein, and any citizen of or person or persons residing or found in the Indian Territory." By the terms of the act of May 2, 1890, (section 31, c. 182, p. 94, 26 St. U. S.,) the statute of limitations of the state of Arkansas was put in force in the territory. Prior to the passage of the act of 1889, there was no court in the territory in which this plaintiff could have sued the defendant. There was no court in which any civil right could be asserted or enforced; nor was there any statute upon any subject in operation in the territory, outside of the acts of congress regulating intercourse with the Indians, and punishing offenses against the United States. The laws of the territory of Missouri had no force or effect in the Indian country after that country ceased to be a part of such territory. A statute of limitations in a country without courts would be an anomaly. When the courts of a country are closed by war, the statute of limita-

tions does not run, (*Hanger* v. *Abbott,* 6 Wall. 532,) and *a fortiori* it does not run in a country which never had either a statute or courts. It is not claimed that the plaintiff's demand is barred or presumed to be satisfied by lapse of time at common law. The condition of affairs in that country before congress passed the act creating a court was bad enough. Those having just claims and demands against persons in the territory were remediless. They could have no redress in the courts, because there were none. It was never supposed that, while they were thus denied any tribunal in which they could assert their demands, the statute of limitations of the territory of Missouri was running against them. There was no statute of limitations in force in the territory until congress, on the 2d day of May, 1890, put in force therein the statute of limitations of the state of Arkansas, and that statute had no retrospective operation, and for that reason, doubtless, it was not pleaded. There is no error in the judgment of the court below, and it is therefore affirmed.