MERCANTILE TRUST CO. v. ST. LOUIS & S. F. RY. CO. (OGDEN et al., Interveners).

(Circuit Court, W. D. Arkansas. August 5, 1895.)

1. JUDGMENTS—LIENS—LIMITATIONS—STAY OF EXECUTION.
   A stay of execution in the record entry of the judgment stays the running of the statute limiting the duration of the lien of the judgment, and does not extinguish the lien, though the stay be longer than the period during which the statute provides that a judgment shall be a lien.

2. SAME—MORTGAGES—PRIORITIES.
   One who takes a mortgage after recovery of judgment by a third person against the mortgagor, the record entry of which contains an agreement that enforcement of the judgment shall be suspended till a certain case be finally decided, takes it subject to the right of the judgment creditor to enforce his judgment after such final determination, within the period limited by statute for lien of a judgment, not counting the time execution was thus stayed.

Suit by the Mercantile Trust Company against the St. Louis & San Francisco Railway Company for foreclosure of mortgage. John B. Ogden and others filed intervening petitions.

By an act of the general assembly of the state of Arkansas, approved April 4, 1887 (Sand. & H. Dig. §§ 6211–6217), the maximum passenger rates on railroads in that state over 75 miles in length was fixed at three cents per mile. By the terms of the act, any traveler who was required by a railroad company to pay for passage on its road a higher rate than the maximum rate fixed by the act was authorized to recover from the railroad company charging such illegal rate not less than $50, nor more than $300, together with an attorney's fee, for each violation of the act. The defendant, the St. Louis & San Francisco Railway Company, although its road was more than 75 miles in length, refused to conform to the requirements of the act, and continued after its passage to charge all passengers in that state at the rate of five cents per mile. The interveners were compelled to pay this illegal exaction, and brought separate suits against the defendant company in the circuit court of Crawford county, Ark., to recover the penalty prescribed by the act for its violation in this regard, and recovered judgments at the times and for the sums following, to wit: John B. Ogden, October 6, 1887, for $85; F. Laurent, October 6, 1887, for $245; W. W. Stevenson, October 5, 1887, for $85; D. T. Reynolds, October 5, 1887, for $85; M. V. Wallace, October 5, 1887, for $85; John Stevenson, October 5, 1887, for $85; John Stevenson, October 5, 1887, for $85; John Stevenson, October 5, 1887, for $85; James Stevenson, October 5, 1887, for $85; A. L. Reynolds, October 5, 1887, for $85; John B. Ogden, October 5, 1887, for $85; R. P. Allen, October 5, 1887, for $85; John Stevenson, October 5, 1887, for $85; F. G. Britt, October 5, 1887, for $85; Joseph Torrent, July 2, 1889, for $410; J. F. Copelan, October 6, 1887, for $85; Charles G. Schneider, October 6, 1887, for $85; Wiley S. Young, July 29, 1889, for $85. The record entry of the judgment in each case contained the following provision: "And it is further agreed that the enforcement and execution of the judgment herein, or any part thereof, be suspended until the case of John Stevenson vs. The St. Louis & San Francisco Railway Company, No. 61 on the common-law docket of this term, be finally decided, and, upon affirmance of said cause No. 61, that execution issue herein, and upon the reversal of said cause that this judgment be set aside, and the defendant allowed to plead herein." On the 3d day of January, 1891, the supreme court

of the state of Arkansas affirmed the Stevenson Case (15 S. W. 22), and thereupon the several judgment plaintiffs, conceiving that the case was "finally decided" within the meaning of the record agreement for the stay of execution, sued out executions on their several judgments, and had the same levied on the real estate of the company in Crawford county. Thereupon the railroad company brought its bill to enjoin the issue or enforcement of the executions on the judgments, upon the ground that the final determination of the Stevenson Case mentioned in the record agreement meant the determination of that case by the supreme court of the United States; and the supreme court of the state upheld this contention of the railroad company, and enjoined the judgment plaintiffs from suing out executions on their judgments, or enforcing the collection thereof by execution or otherwise, until the supreme court of the United States should determine the Stevenson Case. On the 11th of June, 1891, the defendant railroad company executed to the complainant, the Mercantile Trust Company, a mortgage on its road and other property to secure an issue of its bonds. The railroad company made default in some of the conditions of the mortgage, and on the 23d day of December, 1893, the complainant filed its bill against the railroad company, praying, among other things, for the appointment of receivers, which was done. The order appointing the receivers contained the following provision: "And it appearing to the court that the defendant company owes debts and has incurred liabilities which the holders thereof could, without any interference with the legal or equitable rights of the complainant under the mortgage set out in the bill, collect by proceedings at law from said defendant by seizing its rents, income, and earnings, and in other lawful modes, if not restrained from so doing by this court, and that it would be inequitable and unjust for the court to deprive said creditors of their legal right to collect their several debts by appointing receivers to take and receive the earnings of said road during the pendency of this suit, as prayed by the complainant, without making suitable provision for the payment of such debts and liabilities, it is therefore declared that this order appointing receivers herein is made upon this express condition, namely, that all just and legal debts, demands, and liabilities due or owing by the defendant company which were contracted, accrued, or were incurred for ticket and freight balances, or for work, labor, materials, machinery, fixtures, and supplies of every kind and character done, performed, or furnished in the construction, repair, equipment, or operation of said road and its branches, and all liabilities incurred by said company in the transportation of freight and passengers, including damages for injuries to employés or other persons, and to property, which have accrued or upon which suit has been brought or was pending or judgment rendered or the evidence of the debt renewed within twelve months last past, and all liability of said company to persons or corporations who may have become sureties for said company on stay, supersedeas, or cost bonds, or bonds in garnishment proceedings, or other bonds of like character, without regard to the date of such bonds, and also all liabilities to persons or corporations who may have become liable by indorsement, guaranty, or otherwise for the debts of said company for money borrowed by said company to pay operating and other expenses and necessary liabilities of said company, together with all just and legal debts and liabilities which said receivers may incur in operating said road, including claims for injury to persons and property, shall constitute a lien on said railroad and its appurtenances paramount to the lien of the mortgage sought to be foreclosed by the bill in this case; and said railroad shall not be released from such liens until such debts and liabilities are paid. The receivers are authorized and directed to pay all such debts and liabilities, as the same shall accrue, out of the earnings of the road, if practicable, or out of any other funds in their hands which may be used for that purpose; and, if not sooner discharged, then the same shall be paid out of the proceeds of the sale of the road." The supreme court of the United States affirmed the judgment of the state court in the Stevenson Case on the 5th day of March, 1895 (156 U. S. 667, 15 Sup. Ct. 484, 491), and immediately thereafter the several judgment creditors heretofore mentioned filed their petitions of intervention in this cause, praying that the receivers might be required to pay their judgments. The receivers filed no

answer to the petitions of the interveners. The answers of the complainant and defendant company denied that the judgments of the interveners had any superior right or equity over the lien created by the mortgage to the complainant. The intervening petitions were referred to the special master, who reported against the payment of the judgments, to which report the interveners duly excepted. The matter now comes before the court on the evidence and the interveners' exceptions to the special master's report.

Joseph M. Hill filed brief for interveners.

W. W. Green and Lee & McKeighan filed brief for complainant.

E. D. Kenna and B. R. Davidson filed brief for respondent.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The interveners recovered their judgments against the railroad company, and they were liens on the company's property, before the mortgage to the complainant was executed. But it is said the lien of all of the judgments except two had expired before the complainant took its mortgage. This contention is grounded on an erroneous view of the law applicable to the facts of the case. In Arkansas, judgments are liens on the real property of the defendant situated in the county in which the judgment is rendered for the period of three years, and when there has been no interruption to the right of the judgment plaintiff to enforce his judgment lien during the period allowed by the law for that purpose, and the judgment has not been revived, the lien expires at the expiration of the three years; but where, as in these cases, a stay of execution on the judgment for a specified time, or until the happening of a certain event, is made part of the record entry of the judgment, the time during which execution is thus stayed is not to be computed as any part of the three-years limitation of the judgment lien. This is the rule, whether the time of the stay of execution is less or more than the period fixed by statute for the expiration of the lien of judgments. The law gives to the judgment plaintiff three years in which to enforce the lien of his judgment by execution. If the plaintiff does not avail himself of his right to enforce the lien during the time allowed for that purpose, he loses his lien. But the lien of a judgment is not lost if, during the period allowed by law for its enforcement, the plaintiff has been restrained from enforcing it by a stay of execution, duly entered of record, in pursuance of the agreement of the parties to the judgment. The stay of execution, when made part of the judgment entry, stays the running of the statute that limits the duration of the lien. The lien consists in the preferred right it gives the judgment plaintiff to seize and appropriate the property of the defendant to the payment of the judgment. The lien, without the right to enforce it, would be of no utility. The railroad contended, and the supreme court of the state decided, that the proper construction of that paragraph of the record entry of these judgments which provided that execution thereon should be stayed until the Stevenson Case had been "finally decided" meant that execution should be stayed until that case had been decided by the supreme court of the United States. It was perfectly well known that the decision of the supreme court

of the United States in the case mentioned could not be had short of four or five years; and the record shows that it took longer. It is now contended that that part of the record entry of the judgment staying execution thereon until the happening of the event therein mentioned had the effect to extinguish the lien of the judgment before the right to have execution thereon ever accrued. If this contention is well founded, it would make the law say to the judgment plaintiffs: "Your judgments shall be liens on the property of the railroad company for three years, but you shall not enforce the lien until it has expired; and if, in the meantime, the railroad company sells or mortgages its property, the opportunity to collect your judgment is forever lost, and your judgments are worthless." The law is neither so unreasonable nor dishonest. The question of the legal effect on the duration of the judgment lien of the stay of execution in pursuance of a private agreement between a judgment plaintiff and judgment defendant, not entered of record, does not arise in these cases, and need not be considered. In these cases the agreement for the stay of execution is incorporated into the judgment entry, and is in legal effect a part of the judgment itself, and the three-years limitation of the lien begins to run from the time when the stay of execution specified in the judgment expired, which was on the 5th day of March, 1895, the day the supreme court of the United States decided the Stevenson Case. The grantees and mortgagees of the judgment defendant are as much bound by this rule as the judgment defendant itself. The record of these judgments was notice to all persons of the judgments, and their legal effect in respect of the commencement and duration of their liens. The complainant, therefore, took its mortgage with record notice of the rights of these judgment creditors, and, as against them, is as completely estopped to claim that the lien of the judgments had expired as the defendant itself. As sustaining the views here expressed with more or less directness, the following authorities may be consulted: Pennock v. Hart, 8 Serg. & R. 369; Bombay v. Boyer, 14 Serg. & R. 254; 1 Black, Judgm. §§ 470, 471; Work v. Harper, 31 Miss. 107; Linday v. Norrill, 36 Ark. 546; Pindall v. Trevor, 30 Ark. 271; Brewster v. Clamfit, 33 Ark. 72; Cohn v. Hoffman, 50 Ark. 108, 6 S. W. 511; Marshall v. Minter, 43 Miss. 678; 2 Freem. Judgm. (4th Ed.) §§ 382, 394; Batesville Institute v. Kaufman, 18 Wall. 151; Hanger v. Abbott, 6 Wall. 532, 541; Montgomery v. Hernandez, 12 Wheat. 129.

In Bombay v. Boyer, supra, the supreme court of Pennsylvania, speaking by Chief Justice Tilhman, said:

"It was decided by this court in Pennock v. Hart, 8 Serg. & R. 369, that, where the judgment was entered with a stay of execution on record, the five years should run only from the time when the stay of execution expired. But it was not our opinion that any regard should be paid to a stay of execution agreed on by the parties but not appearing on the record."

And in Marshall v. Minter, supra, it was said that enjoining a judgment until a bar of the statute of limitations attaches is an unconscientious advantage which the debtor should not be permitted to take. The lien of the intervener's judgments is prior in time and

superior to that of the complainant, and the receivers must either pay the judgments or submit to have the property sold to satisfy them.

The conclusion reached on this branch of the cases renders it unnecessary to decide whether these judgments do not fall within the class of debts and liabilities of the railroad company which were required to be paid as a condition of appointing the receivers, though it would probably not be difficult to show that they fall within the letter, as they certainly do within the spirit, of that order.

It is suggested that these are judgments for penalties, and it is intimated that a court of equity will look upon them with disfavor for that reason, and will struggle to find some ground of avoiding their payment. These suggestions are unfortunate for the complainant and the defendant. When the origin of these judgments is looked into, it will be found that they are highly meritorious; no judgments could be more so. The defendant company set at defiance the law of the state, and charged its citizens for transporting them over its road two-fifths more than the law of the state allowed for the service. The suits that resulted in these illegal exactions were brought to put an end to these illegal exactions. Although the interveners recovered judgments in the court of original jurisdiction, the defendant company continued to demand and exact five instead of three cents per mile for the transportation of passengers; and, so far as these interveners are concerned, continued to assert its right to do this until the decision of the Stevenson Case by the supreme court of the United States on the 5th day of March, 1895. So far as anything appears in this record, the defendant company would have continued to defy the law of the state, and make these illegal exactions upon its citizens, to the present day, if these interveners had not sought in the mode they did to compel it to respect the law towards themselves as well as all others. The amount of these judgments is infinitesimal compared to the sums charged and received by the railroad company in excess of the legal rate of fare for transporting passengers. Two-fifths of all the money that went into the treasury of the company for fares of passengers represented unlawful and illegal exactions. That money it still has. No portion of it has been returned to the persons who were illegally forced to pay it. The sums illegally exacted from the interveners have never been returned or tendered to them. It required eight years of litigation for the interveners to establish their own and the rights of the public in the premises. The judgments they recovered are very inadequate compensation to them for the service they performed for the public and the long litigation to which they were subjected, and are still being subjected, in a lawful effort to enforce the law of the state and maintain their legal rights. And the amount of these judgments is an absurdly inadequate punishment of the company for its open, gross, and long-continued disregard of the laws of the state and the rights of its citizens. The mass of the people will submit to such illegal exactions rather than incur the trouble, expense, and vexation attending a lawsuit to redress the grievance. Those citizens who take upon themselves the labor, risk,

and expense of prosecuting a lawsuit to vindicate the rights of the public and compel obedience to the law are public benefactors. They are the men who preserve our rights and liberties. They are the John Hampdens of society. A court of equity views with extreme disfavor the action of a railroad company which exacts exorbitant and illegal fares from the traveling public, in violation of the laws of the state from which the company derives its right to operate its road, if not its existence. There would be small safety for the state or its citizens if these artificial creations could with impunity disregard the reasonable and just limitations placed upon their powers by their creator. A court of equity will not under any circumstances set the seal of its approval on such violations of the public rights, but will exercise all its powers and its widest discretion, when the opportunity is afforded it, to encourage every effort of the state or its citizens to put an end to such practices. When a citizen who has paid these unlawful exactions is compelled to sue for a redress of his grievance, he is justly and equitably entitled to something more than the sum of the illegal exactions. That would be no compensation to him and no punishment to the company, and would have no effect in restraining the company from the continued violation of the law. The sum which may be recovered under the statute in such cases is reasonable. It is just to the citizen, and not unduly oppressive on the company. It is compensatory damages for a willful wrong inflicted on the citizen, rather than a penalty. When, as sometimes happens, a railroad company desires to avoid the payment of debts and obligations incurred in the operation of its road, or to reduce the wages of its employés below a fair and reasonable compensation for their services,—there are not many such companies, but occasionally there is one,—it seeks the aid of a friendly creditor, through whose agency it is quickly placed in the hands of a receiver, and immediately a court of equity is asked and expected to do the mean things which the company itself was unable or ashamed to do. But it is believed this is the first instance in which a court of equity has been asked to become, in effect, something bordering very closely on a receiver of stolen goods, and urged to hold the ill-gotten gains in trust for the guilty party, and refuse to make restitution even of the smallest portion of them to the persons from whom they were unlawfully taken. High considerations of public policy, not less than the plainest principles of equity and justice, demand that the property of the defendant company in the custody of the court as a trust fund should be made to respond to the payment of these judgments. And if the lien of the judgments had expired, and the general order relating to the payment of debts did not comprehend them, under the admitted facts of the case, a special order would have to be made for their payment.

The exceptions to the special master's report are sustained, and an order will be entered requiring the receivers to pay to the interveners severally the amount of their respective judgments, with interest thereon from the date of their rendition, and all costs.