GMO. NIEHAUS & CO., C. por A., a corporation organized under the laws of Costa Rica, Apartado 493 San Jose, Costa Rica, and Imke Steinhoff, Kurt Niehaus, Gertrude Boese, Franz Laue and Horst Laue, sometimes incorrectly designated as Franz Boese and Horst Boese, all c/o Dr. Hans Loening, Soegestrasse 18/20 Bremen, Germany

v.

The UNITED STATES.

No. 501-56.

United States Court of Claims.
July 12, 1957.

Philip W. Amram, Washington, D. C., for plaintiffs. Lawrence A. Knapp, Washington, D. C., was on the briefs.

Morton Weinstein, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant. Francis J. Steiner, Jr., Nashville, Tenn., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

This is a suit to recover the value of property belonging to the plaintiffs, and taken possession of by the United States by action of the Director, Office of Alien Property, who purported to act under the Trading with the Enemy Act, 50 U.S.C. A.Appendix §§ 1-40.

The corporate plaintiff is a Costa Rican corporation. Three of the natural plaintiffs are citizens of both Germany and Costa Rica, having dual citizenship. The other two are German citizens. All five have been residents of Germany at all times here pertinent.

On and prior to January 1, 1947, the corporate plaintiff, Niehaus & Co., owned bank deposits in and negotiable securities on deposit in two New York City banks. After that date the five natural persons acquired certain equitable interests in those deposits and securities. On July 26, 1951 the Director, Office of Alien Property, issued what he designated as a Vesting Order, purporting to vest in the Attorney General of the United States all the property referred to above. The New York banks, pursuant to formal demands of the Director, turned the property over to the Federal Reserve Bank of New York for account of the Attorney General. The property is now either in the Federal Reserve Bank, for that account, or is in the Treasury of the United States.

The plaintiffs assert that the President of the United States, by virtue of section 5 of the Trading with the Enemy Act, had the power to designate "when" and "upon what terms" the property or interests of foreign nationals should be taken by the United States; that the President, before the date of the purported vesting of the plaintiffs' property, had limited the vesting power to the vesting of German property and rights which were located in the United States before January 1, 1947; that the natural plaintiffs did not acquire their rights in the property in question until after that date.

The plaintiffs conclude from the foregoing that the action of the officials in "vesting" their property was without any authority or warrant in law, and that they are, therefore, entitled to the property. They are, no doubt, aware that this court cannot order the restoration of the property *in specie*, hence we treat their suit as a suit for its value.

The Government has made a motion to dismiss the petition on the grounds that this court has no jurisdiction of the subject matter of the action, and that the petition fails to state a cause of action upon which the court may grant relief. It points to section 7(c) (4) of the Trading with the Enemy Act which says that "the sole relief and remedy" of any person having any claim to property which has come into the hands of the Alien Property Custodian "shall be that provided by the terms of this Act." The Government then points to section 9(a) of the Act, which says:

"Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian or seized by him hereunder * * * may institute a suit in equity in the United States District Court for the District of Columbia or in the district court of the United States for the district in which such claimant resides, * * * to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian * * *."

One's first impression might be that the Government is urging that the plaintiffs should have sued in the United States District Court. But a more careful perusal of section 9(a) discloses what the plaintiffs point out and the Government admits, viz., that the plaintiffs cannot, under 9(a), sue in the District Court. That section confers the right to sue only upon a person "not an enemy or ally of enemy." The plaintiffs were undoubtedly enemies until the war ended and are still technical enemies within the meaning of section 9(a).

If the seizure of the plaintiffs' property was without warrant of law, as the plaintiffs assert, and if section 7(c) (4)

is applicable in providing that the only relief for one whose property is seized as enemy property is that to be found in the statute, and no relief is to be found in the statute, we have a remarkable situation. Suppose the actual war has long since ended with the unconditional surrender of the enemy, but for sufficient reasons our country does not officially declare the legal termination of the war. Also for adequate reasons we are spending large sums of money and making every effort to rehabilitate the enemy country. That requires, among other things, foreign trade. The President, under the power given him in section 5, officially determines that property brought into this country or acquired in this country by an "enemy" after the date of his determination may not be vested. Property is so brought in or acquired. An overzealous Alien Property Custodian purports to "vest" it.

In the case supposed, there is no relief under section 9(a) because the victim cannot show that he is "not an enemy." Is there no relief in any court, or are such a person and his property outlawed? While the legal state of war continues, our law denies such an enemy any right to prosecute a suit, either with regard to an unauthorized taking by the Government, or a wrongful taking by an individual, or on any account whatever. When the official state of war ends, and the courts are again open to former enemies, such a person may bring suit against an individual who has taken his property while he was disabled from suing. The plaintiffs urge that they may similarly sue the Government, which is in possession of property illegally taken from them by the Government's official.

The Government says sections 7(c) (4) and 9(a) are applicable. If they are, the answer which they give is that there is no relief for such a person. The Government frankly states that, in its view, there is no judicial relief for these plaintiffs in any court. The word enemy in section 9(a) undoubtedly includes a former enemy. If not, every former enemy whose property is in the hands of the Custodian could sue, as soon as the war was officially declared to be at an end.

The Government says that, if the statute is interpreted to outlaw, so far as claims against the Government are concerned, one who has lawfully and, indeed, at the invitation of the Government, brought property into this country, that means only that Congress has asserted, in such cases, the Government's historical immunity from suit. This is probably a correct conclusion. Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434. But the obvious unfairness of such treatment naturally makes one doubt that the statute should be so interpreted, if it will bear a more humane interpretation.

The plaintiffs urge, in effect, that section 7(c) (4), in its statement that the only relief for one whose property has been taken by the Custodian is the relief "provided by the terms of" the Trading with the Enemy Act, refers only to property lawfully taken, and as to which, if the party from whom it is taken has a right to relief, he can obtain it under section 9(a). The case of the vesting of property which the Custodian claims was owned by an enemy, but which non-enemy persons assert that they owned, is a frequent example of such suits.

There is no dispute about the power of the United States, under international law and our Constitution, to confiscate enemy property found in the United States in wartime. United States v. Chemical Foundation, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131. But in this country, the power in the executive to confiscate does not automatically arise from the mere existence of a state of war. The Supreme Court, in an opinion by Mr. Chief Justice Marshall, said in Brown v. United States, 8 Cranch 110, 3 L.Ed. 504:

> "The universal practice of forbearing to seize and confiscate debts and credits, the principle universally received, that the right to them revives on the restoration of peace, would seem to prove that war is not an absolute confiscation of this prop-

erty, but simply confers the right of confiscation."

The Court held that no statute authorized the confiscation of the property there in question, and that the seizure was a nullity. The necessity for statutory authorization of confiscation of the property of enemies was recognized in Miller v. United States, 11 Wall. 268, 78 U.S. 268, 20 L.Ed. 135, opinion by Mr. Justice Strong, and in Silesian-American Corporation v. Clark, 332 U.S. 469, 475, 68 S.Ct. 179, 92 L.Ed. 81, opinion by Mr. Justice Reed.

The doctrine of these cases is that an enemy does not lose his substantive rights in property, merely because of the existence of war, or as a result of a physical act of seizure by persons purporting to act for the Government, unless there is an applicable statute declaring automatic forfeiture or authorizing seizure.

As we have said, enemies were, during the period of the war, disabled from resorting to our courts in any kind of case. Johnson v. Eisentrager, 339 U.S. 763, 776, 70 S.Ct. 936, 94 L.Ed. 1255. The official termination of the war removed the disability to sue. In The Adventure, 8 Cranch 221, 3 L.Ed. 542, opinion by Mr. Justice Johnson, it is said:

"Although property of that description [enemy property in the United States] is liable to be disposed of by the legislative power of the country, yet, until some act is passed upon the subject, it is still under the protection of the law, and may be claimed after the termination of war, if not previously confiscated."

In Hanger v. Abbott, 6 Wall. 532, 73 U.S. 532, 18 L.Ed. 939, opinion by Mr. Justice Clifford, it was held that an enemy creditor could, after the termination of the war, sue upon the debt since the debt had not been confiscated.

■ The authorities cited and sound reasoning lead, we think, to the following conclusions. A purported seizure or "vesting" of enemy property, which sei-

zure or vesting is not authorized by statute, is a nullity, and does not affect the title of the enemy owner. He is, during the war, disabled from vindicating his title by suit. When the war ends, and our courts are again open to him, he may vindicate his title in whatever court may have jurisdiction of his case.

It is necessary now to determine whether the "vesting" of the plaintiffs' property was authorized by statute. As we have seen, section 5 of the Trading with the Enemy Act lodges in the President the authority to designate when and upon what terms property of foreign nationals shall be vested.

■ On July 9, 1951, the President addressed a letter to the Vice President, 97 Cong.Rec., part 6, pp. 7762–7764, explaining what the United States, Britain and France had done to rehabilitate the German Federal Republic, and requesting the Vice President to lay before the Congress, for its consideration, an attached draft of a proposed Joint Resolution to terminate the state of war which existed between the United States and Germany. In the letter are the following statements:

"Ending the state of war with Germany will have many tangible benefits. Germans who wish to travel or to do business here will receive the status accorded to nationals of other friendly governments. They will no longer be classed as enemies. While Germans have been permitted to have commercial relations with this country since the Presidential proclamation of December 31, 1946, declaring hostilities at an end, German citizens are still subject to certain disabilities, particularly with respect to suits in United States courts. General disabilities of this kind will be eliminated by the termination of the present state of war.

"\*     \*     \*     \*     \*     \*

"Furthermore, it is not intended that the termination of the state of war shall in any way change or alter the program, which Congress

has authorized, of seizing, under the Trading with the Enemy Act, German property in this country on or before December 31, 1946, and using the proceeds to pay just and legitimate claims arising from the war in accordance with the War Claims Act of 1948. [50 U.S.C.A.Appendix, § 2001 et seq.] The vesting of German property under this program does not extend to property acquired since the resumption of trade with Germany on January 1, 1947, following the cessation of hostilities. It is limited to German property and rights located here before or during the period of hostilities."

The plaintiffs say that this official communication proves that the President had, under his section 5 power, eliminated the liability to vesting of property in this country acquired by Germans after December 31, 1946. The Government says that the letter was only an explanation to Congress of a policy and a justification for requested legislation, which had no legal significance.

The statement was a statement by the President of the United States, the official primarily responsible for the conduct of our relations with other countries, the official to whom Congress had delegated the power to determine when and on what terms alien property should be seized. If the President and his legal advisors did not know what he had determined the law to be, the country was at sea. If he did know what property he had determined, some years before, should be liable to vesting, and what property should not be so liable, his agents should have, in the several intervening years, acquired the same information.

We are not willing to decide that the plaintiffs' property, at the time and in the circumstances alleged in the petition, was subject to lawful vesting, in the face of the statement of the President of the United States, to whom Congress had delegated the power referred to above, that it was not so subject. We therefore regard the purported vesting as unauthorized and illegal, and as having no effect upon the plaintiffs' title to their property.

■ Under the decisions of this and other courts, this court has jurisdiction of the case as a case "founded upon any Act of Congress," within the meaning of our jurisdictional act, 28 U.S.C.A. § 1491(2). When an official of the United States, purporting to act under a statute, acquires money which money is turned over to the United States, it has been held that this provision of the jurisdictional act is satisfied, and the person from whom the money was taken may sue in this court. In Clapp v. United States, 127 Ct.Cl. 505, 117 F. Supp. 576, certiorari denied 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658, the problem was discussed at some length. Carriso, Inc., v. United States, 9 Cir., 106 F.2d 707, and Ross Packing Co. v. United States, D.C., 42 F.Supp. 932, are in accord.

The defendant's motion to dismiss the plaintiffs' petition is denied.

It is so ordered.

JONES, Chief Judge, and LARAMORE and LITTLETON, Judges, concur.

WHITAKER, Judge (dissenting).

I think jurisdiction to recover property seized by the Alien Property Custodian is expressly denied this court by section 9(f) of the Trading with the Enemy Act, supra. It reads:

"Except as herein provided, the money or other property conveyed, transferred, assigned, delivered, or paid to the Alien Property Custodian, shall not be liable to lien, attachment, garnishment, trustee process, or execution, or subject to any order or decree of any court."

Numerous cases cited in the defendant's brief support this view.